IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANDRE RUDDOCK, #B61610, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. 18-cv-01072-MJR ) |
| ROBERT MUELLER and KEVIN KINK, | ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM & ORDER

**REAGAN, Chief District Judge:**

Plaintiff Andre Ruddock, an inmate who is currently incarcerated at Robinson Correctional Center ("Robinson"), brings this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights at Centralia Correctional Center ("Centralia"). (Doc. 1). According to the Complaint, two former employees of Wexford Health Sources, Inc., named Martha Cowgill and Veronica Lehman, were permanently prohibited from visiting inmates in the Illinois Department of Corrections ("IDOC") in May 2016. (Doc. 1, pp. 7-14). Both individuals were on Plaintiff's list of approved visitors at the time the visitation restriction was imposed. *Id*. Plaintiff claims that Warden Robert Mueller and Assistant Warden Kevin Kink instituted the ban in violation of his First Amendment right to freedom of association and Fourteenth Amendment right to due process of law. *Id*. He seeks declaratory judgment and monetary damages. (Doc. 1, pp. 14-16). He also requests reinstatement of his visitation privileges with both individuals.[1] *Id*.

---

[1] Plaintiff seeks relief on behalf of Cowgill, Lehman, and himself. However, Cowgill and Lehman are not parties to this action. Plaintiff cannot represent them or file papers on their behalf. *See Lewis v. Lenc-Smith Mfg. Co.*, 784 F.2d 829, 831 (7th Cir. 1986); FED. R. CIV. P. 11.

1

This case is now before the Court for preliminary review of the Complaint (Doc. 1) pursuant to 28 U.S.C. § 1915A, which provides:

> (a) **Screening** – The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
> (b) **Grounds for Dismissal** – On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint–
> (1) is frivolous, malicious, or fails to state a claim on which relief may be granted; or
> (2) seeks monetary relief from a defendant who is immune from such relief.

An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Frivolousness is an objective standard that refers to a claim that any reasonable person would find meritless. *Lee v. Clinton,* 209 F.3d 1025, 1026-27 (7th Cir. 2000). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claim of entitlement to relief must cross "the line between possibility and plausibility." *Id*. at 557. At this juncture, the factual allegations of the *pro se* complaint are to be liberally construed. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

## The Complaint

According to the allegations in the Complaint, Plaintiff has been in custody since the age of sixteen. (Doc. 1, p. 8). He anticipates being released when he is forty-six years old. *Id*. His projected parole date is 2022.[2] Plaintiff will return to society as a middle-aged adult who "knows nothing about the [twenty-first] century." *Id*. He has no family support system to help

---

[2] *See* https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch. *Bova v. U.S. Bank, N.A.,* 446 F. Supp. 2d 926, 930 n. 2 (S.D. Ill. 2006) (a court may judicially notice public records available on government websites) (collecting cases).

him with this reintegration, and he wants to avoid the gang and drug scene he encountered in Chicago as a teenager. *Id*.

During his incarceration at Shawnee Correctional Center ("Shawnee"), Plaintiff befriended two female employees of Wexford Health Sources, Inc. ("Wexford"), named Martha Cowgill and Veronica Lehman. (Doc. 1, p. 7). At the time, Cowgill and Lehman worked in Shawnee's health care unit ("HCU"). *Id*. Plaintiff met both of them while serving as a volunteer caretaker for terminally ill inmates. *Id*. Plaintiff's friendship with Cowgill and Lehman survived his transfer and their resignations from Shawnee. *Id*.

A month after Plaintiff transferred to Centralia in March 2015, Cowgill contacted him and informed him that she was no longer employed by Wexford. (Doc. 1, p. 7). She expressed her desire to help Plaintiff with his rehabilitation by offering him moral and spiritual support. *Id*. Plaintiff submitted a proposed Offender Visiting List containing Cowgill's name pursuant to Department Rule 525(a), and the warden approved it on May 7, 2015. *Id*. During the next year, Cowgill visited Plaintiff twice each month without any violations of facility regulations, department rules, state law, or federal law. *Id*.

In late April 2016, Lehman also contacted Plaintiff and informed him that she was no longer employed by Wexford. (Doc. 1, p. 7). Like Cowgill, Lehman asked Plaintiff if she could visit him at Centralia. *Id*. Plaintiff submitted another Offender Visiting List to the warden that included both Lehman's and Cowgill's names. *Id*. On May 6, 2016, Warden Mueller approved the new list. *Id*. Lehman visited Plaintiff the next day. (Doc. 1, p. 8).

Cowgill and Lehman made Plaintiff their "pet project." *Id*. They explained that they wanted to help him reintegrate into society in Southern Illinois following his release, by finding him a job and housing. *Id*. Their goal was to remove Plaintiff from the "criminal elements" in

3

Chicago that led to his imprisonment. *Id*. Cowgill's husband and other family members were aware of this plan. *Id*. Lehman spoke with her cousin about teaching Plaintiff to become a professional horse trainer. (Doc. 1, pp. 8-9).

The plans for Plaintiff's rehabilitation were thwarted by Warden Mueller and Assistant Warden Kink, who imposed a permanent visitation restriction against Cowgill and Lehman on May 13, 2016. (Doc. 1, p. 9). The two women were prohibited from visiting Plaintiff and any other offender indefinitely. *Id*. The ban extended to all IDOC facilities. *Id*. Both wardens took the position that the women had engaged in "inappropriate socialization," but they refused to explain what they meant by this. *Id*.

The term is not defined in the administrative directives or department rules governing inmate visitations. (Doc. 1, p. 9). Plaintiff could find only one rule that might govern the wardens' decision, and he quotes it in the Complaint, as follows:

> Employees who have been involved with offenders or former employees who have either resigned or have been terminated as a result of involvement with offenders may be permanently restricted from visits if it is determined they may be a threat to safety of security.

*Id*. (citing IDOC Rule 525). Plaintiff maintains that this rule is inapplicable to Cowgill and Lehman because they were not "employees" of the IDOC, and they did not resign from or lose their jobs because of their "involvement with offenders." *Id*. They resigned for "personal" or "family" reasons. *Id*. He admittedly has no idea whether the wardens even relied on this rule when imposing the ban. *Id*.

Cowgill contacted Warden Mueller and challenged the decision. (Doc. 1, p. 9). She asked for an explanation. *Id*. Although Warden Mueller acknowledged that Cowgill visited the plaintiff numerous times without incident, the warden refused to clarify what he meant by "inappropriate socialization." *Id*. Cowgill then sent both wardens a letter seeking further

4

clarification, but they did not respond. (Doc. 1, pp. 9-10). Lehman also called the warden's office and spoke with a counselor. (Doc. 1, p. 10). The counselor explained that "inappropriate socialization" meant "she was too familiar with the plaintiff." *Id*. Plaintiff spoke directly to Warden Mueller about the restriction. *Id*. He pointed out that Illinois Administrative Directive 05.01.106(II) § G7b.2 required the warden to outline the incident leading to the restriction in a "Notice of Restriction" letter. *Id*. The warden responded, "This is my facility. I don't need a reason to restrict someone from visiting you." *Id*. He then threatened to turn Plaintiff's life "upside down" for pressing the issue. *Id*.

Plaintiff filed a grievance to complain about the restriction on July 1, 2016, and it was denied. (Doc. 1, p. 10). On December 13, 2016, he requested a 6-month review of the decision and sought restoration of visitation privileges with Cowgill and Lehman. *Id*. Warden Mueller denied the request. *Id*. Plaintiff was informed that the restricted visitors, not Plaintiff, were required to write a letter requesting the 6-month review. *Id*. When Lehman sent two letters to Warden Kink, the warden provided no response. *Id*.

On December 28, 2016, Plaintiff filed a Petition for Writ of Mandamus in Clinton County Circuit Court. (Doc. 1, p. 11). Only then did Warden Mueller respond by filing an affidavit that set forth the reasons for his decision. *Id*. He explained that both women were deemed to have an "inappropriate relationship" with Plaintiff when they worked together at Shawnee, and they were placed on an intra-facility visitation restriction while they were still employed there. *Id*. Because the women allegedly violated IDOC policy while working inside of the prison system, Warden Mueller determined that they might do the same after leaving. *Id*. He was allegedly concerned about possible criminal activity resulting from their ongoing relationship with Plaintiff, so the warden imposed the permanent visitation restriction against them. *Id*.

Plaintiff disputes this. (Doc. 1, pp. 11). During the two years that Plaintiff worked alongside Cowgill and Lehman, they were under the surveillance of security staff and never found to be in violation of IDOC rules or regulations. *Id*. No disciplinary reports were ever issued against Plaintiff for having an inappropriate relationship with either woman. (Doc. 1, p. 12). In fact, no investigation occurred before the restriction was imposed. *Id*.

Plaintiff blames two fellow inmates, who are known white supremacists, for inciting prison officials to impose the restriction. (Doc. 1, p. 12). Inmates Dustin Clover and Travis A. Bramlett objected to the two white women visiting Plaintiff because he is African-American. *Id*. Angry about the relationship, they plotted to end it. *Id*. By spreading false information about Plaintiff's relationship with the two women, Clover and Bramlett incited prison officials to end all further visits. (Doc. 1, p. 13). Clover admitted this in a conversation with Plaintiff. *Id*. In the Complaint, Plaintiff does not allege that the wardens' decision to impose the ban was racially motivated—only that the inmates' conduct was racially motivated. *Id*.

Plaintiff submitted a request for a prison transfer from Centralia to Robinson, and his request was granted on or around January 17, 2018. (Doc. 1, p. 13). Now that he is no longer housed at Centralia, Plaintiff maintains that the wardens' concerns about safety and security at Centralia are moot. *Id*. He asks that the restriction be lifted.[3] *Id*. The ban nevertheless remains in effect and has caused Plaintiff to lose contact with both women. *Id*.

---

[3] Plaintiff seeks injunctive relief to this effect, which the Court construes as a request for permanent injunctive relief at the close of the case. Typically, a plaintiff's transfer from the prison where the complained of conduct occurred renders any request for injunctive relief as it pertains to that facility moot. *Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004). *See also Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1995). Only if Plaintiff can show a realistic possibility that he would again be incarcerated at Centralia under the conditions described in the Complaint would it be proper for the Court to consider injunctive relief. *See Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011) (citing *Ortiz v. Downey,* 561 F.3d 664, 668 (7th Cir. 2009)). At this stage, the Court will reserve its decision regarding the injunction until later in the case. In the meantime, Plaintiff must file a Motion for Temporary Restraining Order and/or Preliminary Injunction pursuant to Rule 65, if he seeks more immediate relief.

## Discussion

To facilitate the orderly management of future proceedings in this case, and in accordance with the objectives of Federal Rules of Civil Procedure 8(e) and 10(b), the Court deems it appropriate to organize the claims in Plaintiff's *pro se* Complaint (Doc. 1) into the following counts:

> **Count 1** - Defendants violated Plaintiff's First Amendment right to freedom of association and/or Fourteenth Amendment right to due process of law by arbitrarily imposing a permanent visitation restriction against Cowgill and Lehman beginning in May 2016.
>
> **Count 2 -** Defendants retaliated against Plaintiff in violation of the First Amendment by imposing a permanent visitation restriction against Cowgill and Lehman beginning in May 2016.
>
> **Count 3** - Defendants deprived Plaintiff of equal protection of the law under the Fourteenth Amendment by imposing a permanent visitation restriction against Cowgill and Lehman beginning in May 2016.
>
> **Count 4 -** Defendants violated Plaintiff's state-created liberty interest in visitation under 730 ILCS § 5/3-7-2(f) by imposing a permanent visitation restriction against Cowgill and Lehman beginning in May 2016.

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. These designations do not constitute an opinion regarding the merits of the above-referenced claims. **Any claims that are encompassed by the allegations in the Complaint but not identified above are considered dismissed without prejudice for failure to meet the *Twombly* pleading standards.**

### Count 1

The Constitution protects "certain kinds of highly personal relationships." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). This includes the right to associate with certain individuals,

including family members.[4] *Id*. However, the right is not absolute when it comes to prisoners. *Easterling v. Thurmer*, 880 F.3d 319, 322 n. 6 (7th Cir. 2018). Prisoners retain a "limited constitutional right" to intimate association, as defined by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78, 95-96 (1987), and confirmed in *Overton v. Brazzetta*, 539 U.S. 126, 131-32 (2003). *Easterling*, 880 F.3d at 322. After all, the "very object of imprisonment is confinement," and the freedom of association has been characterized as "among the rights least compatible with incarceration." *Overton*, 539 U.S. at 131. Restrictions on this right will be upheld if they are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

When considering whether a prison policy is reasonably related to a legitimate penological interest, the Court is required to consider four factors: (1) whether a reasonable connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights. *Turner*, 482 U.S. at 89-91. When reviewing the validity of a prison regulation, the Court may not substitute its own judgment for that of the prison officials. *Turner*, 482 U.S. at 89.

Plaintiff cites a single regulation that might have informed the wardens' decision to restrict Cowgill and Lehman from visitation:

> Employees who have been involved with offenders or former employees who have either resigned or have been terminated as a result of involvement with offenders may be permanently restricted from visits if it is determined they may be a threat to safety of security.

---

[4] The exact nature of Plaintiff's relationship with Cowgill and Lehman is unclear. Certainly, Plaintiff describes them as being like family and standing in the place of his family.

8

*Id.* (citing IDOC Rule 525). Plaintiff admittedly has no idea whether the wardens considered this rule, let alone relied on it when imposing the ban. When asked, the wardens indicated that they needed no reason at all to restrict Plaintiff's visitors, but added that they did so because of "inappropriate socialization" and later cited safety concerns and prison security as reasons for their decision.

Plaintiff insists that the wardens' decision was purely arbitrary, permanent, and unreviewable. The Seventh Circuit Court of Appeals has held that "prison officials may violate the Constitution by permanently or arbitrarily denying an inmate visits with family members in disregard of the factors described in *Turner* and *Overton*." *Easterling*, 880 F.3d at 322-23. This is consistent with the Supreme Court's acknowledgement that a restriction "applied in an arbitrary manner to a particular inmate" may violate the inmate's constitutional rights. *Overton*, 539 U.S. at 137. Plaintiff maintains that he was subject to an arbitrary restriction.

To survive a procedural due process challenge, the prisoner must demonstrate that (1) he has a protected liberty or property interest that the state has interfered with; and (2) the procedures he was afforded were constitutionally deficient. *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007). An inmate's liberty interests are protected by the Due Process Clause only insofar as a deprivation of the interest at issue would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The denial of access to a particular visitor "is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). As such, the denial of visitation with a particular person is generally not independently protected by the Due Process Clause. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 461 (1989). In several unpublished opinions, the Seventh Circuit has held that restrictions on

association with non-incarcerated individuals did not give rise to a protected liberty interest or trigger due process protections. *See, e.g., Cherry v. McCaughtry*, 49 Fed. Appx. 78 (7th Cir. 2002) (inmate's temporary inability to visit his fiancé did not implicate a liberty interest); *Billups v. Galassi*, 202 F.3d 272 (7th Cir. 2000) (visiting privileges with girlfriend could be permanently revoked without a hearing "or any other due process protection"). Whether any protected liberty interest was at stake in the present case is not clear, given the current landscape of the law and the particular nature of Plaintiff's relationship with Cowgill and Lehman. However, Plaintiff alleges that he was denied all procedural due process protections.

At this early stage, the Court lacks sufficient information to decide this thorny issue under the First or Fourteenth Amendment. Dismissal of Count 1 is not appropriate, and this claim shall receive further review against Warden Mueller and Assistant Warden Kink.

**Count 2**

To succeed on a First Amendment retaliation claim, a plaintiff must demonstrate that (1) he engaged in conduct protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the protected conduct was a "motivating factor" for taking the retaliatory action. *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Beyond baldly asserting that the defendants' decision regarding visitation was retaliatory in nature, Plaintiff offers no factual allegations to support this claim. He fails to explain what protected conduct gave rise to the claim or was deterred by the defendants' actions. This includes the threat by Warden Mueller to turn Plaintiff's life "upside down" for pressing the visitation issue. The warden made this comment after imposing the ban and subsequently took no action against Plaintiff with regard to the ban that could be construed as retaliatory in nature. This claim does not satisfy the pleading

standard discussed in *Twombly* and shall be dismissed without prejudice for failure to state a claim upon which relief may be granted.

**Count 3**

To establish a prima facie case of discrimination under the Fourteenth Amendment Equal Protection Clause, a plaintiff must show that he "is a member of a protected class," that he "is otherwise similarly situated to members of the unprotected class," and that he "was treated differently from members of the unprotected class." *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005) (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501 (7th Cir. 1993) (citing *McMillian v. Svetanoff*, 878 F.2d 186, 189 (7th Cir. 1989)). In the Complaint, Plaintiff explains that he is African-American and was singled out because of his race by two white supremacist inmates. They spread false information about him, which contributed to the defendants' decision to impose the visitation restriction against Cowgill and Lehman.

There are several problems with this claim. First, Plaintiff cannot assert a constitutional claim against his fellow inmates. They are not state actors who are subject to suit under § 1983. Second, although both defendants are "persons" who are subject to suit under § 1983, Plaintiff does not allege that either warden imposed the visitation restriction against Cowgill and Lehman based on race considerations. The ban extended to visitation by the two women with inmates throughout the IDOC regardless of race. The equal protection claim does not survive screening.

A class-of-one equal protection claim arises from an allegation that the plaintiff has been denied equal treatment for no rational reason. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To succeed on a class-of-one claim, the plaintiff must show, at a minimum, that (1) defendants intentionally treated him differently from others similarly situated and (2) that there was no rational basis for the difference in treatment. *Id.* A plaintiff may plead himself out of

court by providing a rational basis for the treatment in the complaint. *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013). Here, the allegations refute a class-of-one claim. Plaintiff was denied visitation rights with Cowgill and Lehman just like all other inmates in the IDOC. In other words, Plaintiff was treated the same as other inmates. Count 3 shall be dismissed without prejudice against both defendants for failure to state claim upon which relief may be granted.

## Count 4

Plaintiff asserts a claim against the defendants for alleged violations of 730 ILCS § 5/3-7-2(f), which governs visitation of prisoners. Because this claim arises from the same operative facts as the original federal claims, the Court has supplemental jurisdiction over the claim. *See* 28 U.S.C. § 1367(a); *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008). However, Count 4 does not survive preliminary review.

The Court found no authority suggesting that Illinois courts would infer a separate damages remedy from statutes regulating the IDOC. The Department of Corrections' regulations and the Illinois Unified Code of Corrections were "designed to provide guidance to prison officials in the administration of prisons" and not to confer rights on inmates. *Ashley v. Snyder*, 739 N.E.2d 897, 902 (Ill. App. 4th Dist. 2000); *McNeil v. Carter*, 742 N.E.2d 1277, 1280-81 (Ill. App. 3d 2001). The failure of prison officials to follow state rules or administrative regulations also does not give rise to a constitutional claim, although it may provide some support for such a claim. *Pasiewicz v. Lake Cnty. Forest Preserve Dist.*, 270 F.3d 520, 526 (7th Cir. 2001) ("The federal government is not the enforcer of state law."). Accordingly, Count 4 fails to state a claim upon which relief may be granted and shall therefore be dismissed with prejudice from this action.

**Disposition**

**IT IS HEREBY ORDERED** that **COUNT 1** is subject to further review against Defendants **ROBERT MUELLER** and **KEVIN KINKS**.

**IT IS ORDERED** that **COUNTS 2** and **3** are **DISMISSED** without prejudice and **COUNT 4** is **DISMISSED** with prejudice for failure to state a claim upon which relief may be granted.

As to **COUNT 1**, the Clerk of Court shall prepare for Defendants **ROBERT MUELLER** and **KEVIN KINKS**: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint (Doc. 1), and this Memorandum and Order to each Defendant's place of employment as identified by Plaintiff. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that Defendant, and the Court will require that Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

With respect to a Defendant who no longer can be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to United States Magistrate Judge **Stephen C. Williams** for further pre-trial proceedings.

Further, this entire matter shall be **REFERRED** to United States Magistrate Judge **Williams** for disposition, pursuant to Local Rule 72.2(b)(3) and 28 U.S.C. § 636(c), *if all parties consent to such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under § 1915, Plaintiff will be required to pay the full amount of the costs, even though his application to proceed *in forma pauperis* was granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that at the time application was made under 28 U.S.C. § 1915 for leave to commence this civil action without being required to prepay fees and costs or give security for the same, the applicant and his or her attorney were deemed to have entered into a stipulation that the recovery, if any, secured in the action shall be paid to the Clerk of the Court, who shall pay therefrom all unpaid costs taxed against plaintiff and remit the balance to plaintiff. Local Rule 3.1(c)(1).

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED: August 1, 2018**

s/ MICHAEL J. REAGAN
**Chief Judge**
**United States District Court**